UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JASPER L. MILLS

          Plaintiff

V.

P. DAVID SOARES, in his official and individual capacities,
JESSICA BLAIN-LEWIS, in her official and individual capacities,
EMILY SHULTZ, in her official and individual capacities,
CHRISTOPHER HORN, in his official and individual capacities,
JAMES SOKOLOWSKI, in his official and individual capacities.
JOHN DOE, in his official and individual capacities,
THE COUNTY OF ALBANY OFFICE OF THE DISTRICT ATTORNEY,

          Defendants

**COMPLAINT**
**JURY TRIAL DEMANDED**

Case No.: 1:25-CV-0734 (MAD/PJE)

-----------------------------------------------------------------------

Comes now the Plaintiff, JASPER L. MILLS, by and through his attorney, Jeffrey S. Shelly,

Esq., as and for his Complaint against Defendants David Soares, Jessica Blain-Lewis, Emily

Shultz, Christopher Horn, James Sokolowski, John Doe and the County of Albany Office of the

District Attorney, alleges the following:

## PRELIMINARY STATEMENT

1. This Complaint reveals what happens when power is entrusted in a handful of people to
   ensure justice, but they misuse that sacred power to, instead, bring about injustice and
   harm to one who opposes and challenges them.

2. By ordering and engaging in an illegal and unconstitutional search; by making false
   statements in papers filed with the court, and in public; by attempting to appoint the
   Attorney General as a special prosecutor in contradiction of law; by ignoring and
   disobeying orders of the court; and by failing to perform the legally required duties of

their office; Defendants have abused legal process in furtherance of a malicious investigation and prosecution of Plaintiff. They conspired to do all of this, as well as to defame Plaintiff.

3. Through this blatant and unconstitutional abuse of power, Defendants engaged in a coordinated and concerted investigation to defame Plaintiff, eliminate him as opposing defense counsel in ongoing criminal proceedings, and undermine his candidacy for Family Court Judge of Albany County. Defendants misled and used the Courts by making dishonest and false statements and withholding relevant and essential facts, thereby casting doubt on the legality and ethics of Plaintiff's actions. In doing so, they not only succeeded in having Plaintiff lose the all-important Albany County Democratic Party primary for Family Court Judge, but Defendants also caused him great financial harm and emotional distress. As a result of Defendants actions and statements, Plaintiff has lost clients and business opportunities, lost an election, lost respect within the legal community, and lost his reputation within the greater community at large.

## JURISDICTION

4. Jasper L. Mills brings this lawsuit under the United States Constitution, and pursuant to Title 42 U.S.C. Section 1983 et. Seq. & Section 1988. This Court has subject matter jurisdiction of this lawsuit based upon Title 28 U.S.C. Sections 1331 (federal question and 1343(3) (equal rights). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to Title 28 U.S.C. Section 1367.

## VENUE

5.  This Court is the proper venue for this lawsuit pursuant to 28 U.S.C. Section 1391(b)(1) because all of the events complained of occurred within the Northern District of New York, and the Defendant municipality and individual Defendants (except for P. David Soares) are located within the Northern District of New York and, upon information and belief, all of the Defendants reside within New York State.

## PARTIES

6.  Plaintiff Jasper L. Mills (hereinafter "Plaintiff" or "Mills") is an African American male who, at all times material to the allegations of this Complaint, was and is a resident of the State of New York. He is an attorney in good standing and admitted to the New York Third Judicial District since 2007.

7.  Defendant The County of Albany (hereinafter the "County") is a political subdivision within the State of New York and provides governmental services for the public within the County of Albany. The County of Albany Office of the District Attorney (hereinafter the "District Attorney's Office") is an administrative arm of the County and is maintained by the County for the welfare of the public.

8.  Defendant P. David Soares (hereinafter "Soares") was the District Attorney for, and an employee of, the County and was acting within the scope of his authority during the time material to the allegations of this Complaint. Up to and including December 31, 2024, Soares was the duly-elected District Attorney for the County and performed the duties of that Office and, upon information and belief, resided in Albany County, New York. Upon information and belief, Soares currently resides in the State of Georgia

9.  Defendant Jessica Blain-Lewis (hereinafter "Blain-Lewis") was an Assistant District Attorney for, and a public officer of, the County and was acting within the scope of her

authority during the time material to the allegations of this Complaint. Upon information and belief, Blain-Lewis is a resident of the State of New York.

10. Defendant Emily Shultz (hereinafter "Shultz") was an Assistant District Attorney for, and a public officer of, the County and was acting within the scope of her authority during the time material to the allegations of this Complaint. Upon information and belief, Shultz is a resident of the State of New York.

11. Defendant Christopher Horn (hereinafter "Horn") was an Assistant District Attorney for, and a public officer of, the County and was acting within the scope of his authority during the time material to the allegations of this Complaint. Upon information and belief, Horn is a resident of the State of New York. (collectively, Defendants Soares, Blain-Lewis, Shultz, Horn and the District Attorney's Office are hereinafter referred to as the "Soares' Office").

12. Defendant James Sokolowski (hereinafter "Sokolowski") was a New York State Police Investigator for, and a public servant within, the New York State Police and was acting within the scope of his authority during the time material to the allegations of the Complaint. Upon information and belief, Sokolowski is a resident of the State of New York.

13. Defendant John Doe (hereinafter "Doe") was a New York State Police Investigator, Trooper or Officer for, and a public servant within, the New York State Police and was acting within the scope of his authority during the time material to the allegations of the Complaint. Upon information and belief, Doe is a resident of the State of New York. (collectively, Sokolowski and Doe are hereinafter referred to as the "State Police Defendants").

## OVERVIEW

14. In an effort to block Plaintiff's continued representation of criminal defendants in two separate felony cases that Defendants were prosecuting against the clients of Plaintiff and other criminal defense attorneys, and to harm Plaintiff's standing and reputation in the legal community, Defendants began a largely publicized criminal investigation of Plaintiff and two other criminal defense attorneys in June of 2024.

15. Defendants commenced this criminal investigation into the Plaintiff and two other attorneys, Daniel Smalls, Esq, and Samantha Chorney, Esq., by ordering the Albany County Sheriff's Office to execute a search of the attorneys' clients' jail cells and remove any legal documents that the Sheriff and Defendants found to be in violation of a protective order.

16. At the time of this order, these incarcerated individuals were not convicted of any of the crimes charged, rather, they were pretrial detainees with a constitutional expectation of privacy in their legal documents.  At least two of those detainees (including the one represented by Plaintiff) had no other convictions or charges holding them in jail.

17. On June 5, 2024, Plaintiff received a "witness disclosure" form from Blain-Lewis, which identified the names of two witnesses who were to testify in an upcoming trial.  This witness information had been previously disclosed to the attorneys through discovery at the outset of that case and, importantly, *before* any protective order was in place.

18. That same day, Plaintiff reported to Blain-Lewis that he had received communication leading him to believe that someone had obtained the "witness disclosure" without authorization.

19. Plaintiff told Blain-Lewis the investigatory steps he had taken after receiving that communication, and prior to reporting it to her.

20. Plaintiff volunteered to assist the Soares' Office with whatever was necessary to address this disclosure and to take any necessary steps to ensure the safety of their witnesses.

21. On June 6, 2024, the District Attorney's Office filed an Order to Show Cause (hereinafter "Order to Show Cause") in the pending criminal case with both an Affirmation and a Supplemental Affirmation, to be heard the following day, which requested, *inter alia*, the court to determine that the protective order issued in that case was, in fact, violated.

22. Both the Affirmation and the Supplemental Affirmation submitted intentionally excluded the relevant information that it was Plaintiff who had brought the possible violation to the attention of Defendants but, instead, contained only conclusory, baseless and inflammatory assertions against Plaintiff.

23. On June 7, 2024, the Order to Show Cause was heard before Judge Andra Ackerman, who was sitting in for the judge assigned to the case. During that hearing, Blain-Lewis, knowing substantial media, attorneys and clients were present, became accusatory towards Plaintiff in nature and alleged, without facts, that Plaintiff had provided documents covered by a protective order to a third party and somehow was the cause of a death threat to a possible witness.

24. Throughout this court appearance and throughout numerous documents and statements made by the Defendants, the Defendants have referred to the "disclosed" individual as a "confidential informant," even though Judge Roger D. McDonough, who was assigned to preside over the case, determined that to be untrue.

25. On June 11, 2024, Judge McDonough referred the investigation of the possible breach to the New York State Police so that an independent investigation could be commenced into the allegations of a potential violations of the protective order. The judge's ruling explicitly

removed the Soares' Office from participation in this independent criminal investigation, recognizing the inherent conflict of interest in having the Soares' Office criminally investigate the attorneys for the pre-trial detainees which the Soares' Office was then prosecuting in the same court.

26. At the June 11th hearing, attorney Daniel Smalls requested that the court provide the lawyers with a list of any documents deemed protected material recovered from the clients' cells. That request was denied. The court made it clear, however, that only the State Police were to perform the investigation of this matter, and those same State Police were to report their findings to the court and that the court would determine what additional steps, if any, were warranted.

27. At a video-recorded "meet the candidates" forum for the position of the Albany County District Attorney that very same day, Soares, referencing allegations in a newspaper article[1], made public statements about Plaintiff, stating that Plaintiff "a defense attorney, in violation of a protective order, provided a witness list to the people who are going on trial." Soares went on to claim that this had caused a prosecution witness being held in federal prison to have his life threatened.

28. In these public statements, Soares equated the Plaintiff's alleged conduct to the "the worst Quentin Tarantino movie ever imagined," and, attempting to invoke fear and/or anger from

---

[1] These "allegations" were the allegations made by the Soares' Office in their Order to Show Cause, the June 7, 2024 hearing and the June 11, 2024 hearing. Now, however, Soares was intentionally and maliciously repeating these false statements made to the court in a well-attended public forum that he knew was being recorded for dissemination to the public. Soares knew those allegations were false, yet he willfully avoided the truth and repeated those lies. The newspaper article Soares was referencing specifically singled out Plaintiff; and Soares, and anyone in attendance or watching on the internet, who had read that article, knew that Plaintiff was the attorney that Soares was identifying. Unequivocally, Soares' statements were much more than just a reckless disregard of the truth.

the listening public, stated that such actions are, instead, real life. Soares painted a perilous picture, referring to bullets flying through windows, yet he also disclosed the exact location of this purported "confidential witness" to the public. Soares made these false and defamatory statements in a forum that he knew was being recorded for public dissemination, and which was later uploaded to YouTube.

29. At that forum, and in response to the above statements, the current Albany County District Attorney, Lee C. Kindlon, reminded Soares of his legal obligation to *not* make public comments on any open investigations and pending criminal matters. Soares laughed at that reminder rather than heeding it.

30. The statements made by Soares and his assistants about Plaintiff were made with knowledge that these statements were false and intended to cause harm to Plaintiff, his profession, livelihood and business, and his reputation.

31. Subsequently, and contrary to Judge McDonough's instructions, on June 11, 2024, the Defendants continued an active criminal investigation of Plaintiff separate from the one specifically directed by the judge.

32. Defendants were subsequently questioned about their involvement in such investigations by judges in the criminal cases for Plaintiff's clients, yet they explicitly *denied* to the judges – on the record in open court, in their papers, and on multiple occasions – that they had commenced and/or had actively participated in the criminal investigation of Plaintiff and other attorneys. Such denials by Respondents were knowingly and intentionally false statements (some made in sworn documents) to a judge on the record or in the court chambers.

33. In fact, as evidenced by documents provided by the Soares' Office during motion practice, the Soares' Office has continued a criminal investigation into the Plaintiff. In addition, other individuals reported that they were requested by the Soares' Office to play an active and surreptitious role in this criminal investigation (in particular, of Plaintiff), even though Judge McDonough had explicitly instructed the Soares' Office that any such investigation must be conducted by the New York State Police.

34. The Soares' Office also contacted and spoke with other Assistant District Attorneys in other counties in an attempt to obtain damaging information pertaining to Plaintiff.

35. Additionally, despite Judge McDonough's instructions on June 11, 2024, the Soares' Office unlawfully and unilaterally designated a special prosecutor to pursue the criminal investigation of Plaintiff and the other attorneys, even though the judge had required that all materials found by the New York State Police would only be provided to the judge, and for the court to determine the next steps.

36. Finally, to preclude Plaintiff's representation in the criminal cases, and to damage his standing as lawyer with current and potential clients, colleagues, the courts, and the community at large, and with the voters of Albany County as candidate for Albany County Family Court Judge, the Soares' Office made multiple motions, citing to what they claimed was the criminal conduct of Plaintiff, to disqualify Plaintiff from representing clients in the criminal case before Judge McDonough and other matters. The Soares' Office knew, and knows, that the vast number of the clients represented by Plaintiff are African-American. The actions and false or misleading statements or omissions by the Soares' Office to eliminate Plaintiff as defense counsel were motivated, at least in part, by racial animus or bias.

## DETAILED FACTUAL ALLEGATIONS

### The Order to Show Cause Filed by the Soares' Office Intentionally Misstated and Misrepresented Material Facts, Deliberately Misled the Court, and Was Based on an Illegal and Unconstitutional Search

37. On June 6, 2024 the Albany District Attorney's Office, through Blain-Lewis, filed an Order to Show Cause with both an Affirmation and a Supplemental Affirmation (collectively referred to hereinafter as the "Order to Show Cause"), to be heard the following day and requesting that the court to make a determination that a protective order issued in the matter of the *People of the State of New York v. Terrance Anthony, Marcel Perry, Vramir Branch and Rajim Coleman*, Indictment No. 71634-22, Index No. 378-22, was, in fact, violated.

38. In that criminal case, Vramir Branch was and is currently represented by Jasper Mills. Terrance Anthony was and is represented by Daniel Smalls, Marcel Perry was and is represented by Paul Edwards and Rajim Coleman was and is represented by Samantha Chorney (collectively these criminal defendants are referred to herein as the lower-case "defendants").

39. On June 7, 2024 the Order to Show Cause was heard before Judge Andra Ackerman. Judge Ackerman was acting in place of the judge assigned to the case, Judge Roger G. McDonough, due to his unavailability that day. The Soares' Office knew that Judge Ackerman had little to no knowledge of the case, including the relevant protective order and the prior discovery in the case. Upon information and belief, that is why the Soares' Office brought the Order to Show Cause when Judge McDonough was unavailable.

During the hearing, Blain-Lewis became accusatory in nature, falsely claiming that the defense attorneys involved in the case, and Plaintiff in particular, had provided protected information to their incarcerated clients.

40. The Order to Show Cause was based on misrepresentations and misconduct by the Soares' Office. The Order to Show Cause filed by the Soares' Office, as well as their representations to the court, intentionally omitted several key pieces of factual information. In doing so, the Soares' Office ignored the fact that an attorney or counselor is guilty of a misdemeanor if he or she is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. *See* New York Judiciary Law Section 487.

41. The willful conduct of the Soares' Office was deceitful and obstructionist, and injected misrepresentations and false information into the judicial process to seriously undermine the integrity of the proceeding. This conduct threatened the integrity of the legal system and constituted a wrong against the institutions set up protect and safeguard the public. Indeed, the actions of the Soares' Office seriously undermined the integrity of the judicial process.

42. The day before this Order to Show Cause was heard by Judge Ackerman, there had been a search conducted of the cells of the above-mentioned defendants, and no information had been provided to defense counsel or defendants regarding the basis of that search.

43. The Soares' Office intentionally failed to attach or reference a letter written by Horn (later discovered by defense counsel) that the Soares' Office provided to the Albany County Sheriff's Office. In that letter, the Soares' Office ordered the search of the cells of the defendants. This letter is significant because the basis stated therein to order this search

did not, and does not, constitute sufficient probable cause to warrant such a search, and the letter included misrepresentations pertaining to the contents of a phone call made by Marcel Perry which was used as the purported basis of this order by the Soares' Office.

44. This order to the Albany County Sheriff's Office by the Soares' Office should have triggered Fourth Amendment protections that the defendants have in their cells as pretrial detainees, which made the subsequent search illegal and in violation of their Constitutional rights.

45. If this letter had been filed with the Order to Show Cause and Affirmation, or provided to defense counsel at that time, defendants could have challenged the veracity of such a document and the resulting illegal search of their cells. Upon information and belief, the Soares' Office was aware that if this letter had been revealed at that time, the defendants, their attorneys, and the court would have realized that the basis for the search of defendants' cells was nothing more than a baseless request by the Soares' Office *for investigatory purposes*, rather than institutional safety. Under such circumstances, the Order to Show Cause brought by the Soares' Office should have been denied, the search would have been vehemently opposed by defense counsel, and the representations made by the Soares' Office would have exposed them to sanctions. Instead, this information was intentionally omitted, leaving the defendants and their attorneys with no knowledge of the representations that had served as the basis for the search, and without sufficient information to challenge that illegal search and the Order to Show Cause.

46. This concealment of how and why the defendant's property was seized was a willful act of fraud, misrepresentation and misconduct by the Soares' Office that was meant to undermine the conduct of the court and its ability to make a proper, informed and just

ruling. The Soares' Office knew that the court could not make an informed and reasoned determination as to the legality of this search without this withheld information, yet the Soares' Office deliberately withheld that information.

47. The Soares' Office also concealed the fact that defendants received multiple discovery disclosures, including the names of potential witnesses which included those in the June 5, 2024 "witness disclosures," *prior to* the issuance of any protective orders. As a result, the names of those witnesses were neither confidential nor protected.

48. The Soares' Office failed to tell the Court that (i) materials had been disclosed to the defendants prior to the issuance of any protective order, and (ii) materials had been provided during the discovery process and made available to the defendants outside the scope of any protective order. Without this information it was impossible for the court to conduct any knowledgeable in-camera review of the items recovered from the cells to determine whether there was an actual violation of a protective order. This deception occurred despite the fact that (i) documents eventually filed by the Soares' Office with the court specifically acknowledged that they had disclosed unprotected documents and information prior to having a protective order in place (which included witness information), and (ii) the Soares' Office had referred to additional disclosed and unprotected items and information just three days prior (*i.e.,* on June 4, 2024) before Judge McDonough. (and the Soares' Office knew Judge Ackerman was unaware of that prior admission due to the fact that she was not previously involved in the case).

49. The Soares' Office further failed to inform Judge Ackerman that, when they applied for a protective order, they never requested an order applying the protective order retroactively to cover information that had already been provided or disclosed to the defendants, or to

any information previously disclosed outside of the scope of the requested protective

order. If Judge Ackerman been made aware of this information, she could have made an

informed and knowledgeable determination as to whether there had been, in fact, a

violation of a protective order.

50. These misrepresentations and omissions of key pieces of information by the Soares'

Office deprived the defendants of a legal defense in opposition to the Order to Show

Cause, manipulated the decisions made by the court pertaining to the Order to Show

Cause, and undermined any determination as to whether a violation of a protective order

occurred and whether there should be a State Police Investigation into any such violation.

These misrepresentations and omissions made by the Soares' Office were intentionally

committed to place the defendants and their attorneys at a distinct disadvantage to

challenge those determinations.

51. As a result, without any information provided to Judge Ackerman regarding the

disclosures made by the Soares' Office *prior to* the issuance of a protective order, or the

purported basis for the search of defendants' cells, it was determined that the defendants

were in possession of possibly protected materials.

52. Thereafter, on June 11, 2024, Judge McDonough referred the matter to the New York

State Police for an independent forensic investigation. Judge McDonough ordered the

New York State Police to report their findings to the court at the conclusion of their

investigation and made it clear that the court would determine the next steps. The Soares'

Office was ordered to have their investigators turn over all materials to the New York

State Police to avoid compromising the investigation by having improper contact with the

agency conducting the investigation.

53. These action by the Soares' Office did not just have a legal impact on the defendants in that criminal case. Rather, the Soares' Office placed Plaintiff's actions, legal judgment, ability and ethics at issue in open court. The Soares' Office knew this would be reported by the local press because, upon information and belief, the Soares' Office had informed the press of this last-minute hearing on the Order to Show Cause specifically to have the issues concerning Plaintiff reported to the general public.

**The Soares' Office Misrepresented Why and How They Alleged that the Criminal Defendants Were in Possession of Documents or Information in Violation of the Protective Order.**

54. On June 5, 2024, the Soares' Office sent a letter to Albany County Sheriff Craig Apple with a copy of a Protective Order dated October 27, 2022, alleging "Pursuant to Criminal Procedure Law 245.70(7), these Protective Orders are "***a mandate of the court for the purposes of the offense of criminal contempt in subdivision three section 215.50 of the penal law. Therefore, possession of said documents by the defendants in violation of these orders is illegal, i.e. contraband***..." (emphasis added). The Soares' Office letter to Albany County Sheriff Craig Apple stated that "***based upon the context of a recorded call*** and in court observations, the People believe that three of the four defendants are in possession of material in violation of that explicit court mandate..." (emphasis added).

55. The Soares' Office contended that the basis for the search requested of Sheriff Apple was revealed in a June 4, 2024, recorded jail call purportedly made by defendant, Marcel Perry that lasted 17 minutes and 31 seconds. In relevant part, it begins at or about minute "01:41" and concludes at or about "05:37". A transcript of that call is as follows:

Perry: Hello

Recipient: What's up

Perry:  Tell me why my lawyer just came to meet me and argue – He come to see me right? You know I flipped yesterday… so, I started off with I apologize with how I was acting and all that right? How he started arguing the witnesses on the case and shit like that… you know?

So, they saying "bro" is a confidential informant… you know at I'm saying?

Recipient: Who is "bro"

Perry: Chris… I'm like so?

Recipient: Oh word?

Perry:  So, I'm like so? I know him. This is somebody I grew up with… he's a confidential informant. So what? I don't care about none of that – you understand what I'm saying like if y'all got him going to testify, so be it… let him testify, I don't care." What I'm arguing is why am I on this case. Why y'all trying to distract me from arguing why am I on this case. Like, I don't care who is saying nothing. Nobody say I – from the start nobody said I did anything. So, what gave y'all probable cause to take my phone, to take my clothes, to go on my Facebook, to go on my phone. What gave you probable cause when the warrant says that he had nothing? Let's argue my due process "bro".

Recipient: Right, Correct.

Perry:  We have to get this on the record… you understand what I'm saying?

So, he stopped arguing it. Now – wait - before all that he asked me did I have a job. I'm like yeah I was working 50 hours a week for general insulation… you understand what I'm saying? He said so what do you want me to do?

I said "yo so you showing me this but you're saying I can't leave with none of this right?"

He said "yeah, because that goes against the protective order."

I said "yo for one, my co-defendants **left** with paperwork… why can't I have paperwork?

He said "well, they're violating the protective order. I said "so, you mean to tell me my co-defendants can have paperwork, but I can't and they violated the protective order? You move like a public defender"

He said "I'm not a public defender, I work for you Mr. Perry. What do you want me to do?"

I said "for one, we need to go to court or we need to put on the record those warrants were invalid… the grand jury testimony was defective – I mean the grand jury has nothing with me. What am I doing on this case? Somebody has to tell me something – we not going to trial with those warrants like this. There is no probable cause to my stuff which y'all about to use this against me at trial. How y'all violating my rights?

<u>He said</u> "you know what I'm going to court tomorrow – I'm going to bring up that your co-defendants violated the protective order."

I said "I don't care what you bring up – as long as you put on - that on record about those warrant applications. I have nothing to do with my – their lawyers giving them their stuff… <u>they did it in the courtroom</u>."

Recipient: Because how are the – they wouldn't be violating.

Perry: That is what I'm telling him.

Recipient: The protective order was lifted – that means y'all have rights to everything

Perry: Exactly! He is saying "I can't have nothing that is automatic disclosure. There is nothing on me, you understand what I'm saying? There is nothing to give me – we need to have this in front of the judge and ask him what am I doing on this case? He said "look! Tomorrow, I'm going to get you into court – it's going to be me, the prosecutor, you and the Judge. I said "Ok! As long we putting that the warrants were invalid and the Judge is ruling on my due process rights and everything that I argue and the letter that I wrote him but that is all that better be coming at me tomorrow". So, how we have court date?

Recipient: (inaudible)

Perry: huh?

Recipient: What time you go?

Perry;  I don't know what time. He was like "I'm going to get you a court date tomorrow – we going to argue this in front of the Judge." I went "aight, straight up" and got up and left.

56. While discussing what happened the day before in court, *i.e.,* seeking "paperwork" from his attorney, Mr. Perry stated to Mr. Edwards that "my co-defendants left with paperwork" to which Mr. Edwards claims "well, they're violating the protective order…" Importantly, although neither Mr. Perry nor Mr. Edwards knew exactly what was purportedly given to Mr. Perry's codefendants, Mr. Perry specifically states it was given to them at court the day before.

57. However, both Mr. Edwards and Ms. Blain-Lewis were present in court the day before to witness Judge McDonough place on the record the issue of "the proposed Antommarchi Waiver" for each defendant. (Tr. p. 14-26 (lines 1-18)).  During the discussion of "the proposed Antommarchi Waiver" for each defendant, Mr. Perry asked to address the Court but was directed by the court to confer with his counsel and encouraged to have his concerns addressed through his attorney. (p. 15 (lines 8-25) -17 (lines 1-7)).  Then, the court moved on to Mr. Coleman to have "Court's Exhibit 1" marked on the record. (p.17 (lines 8-25) -18 (lines 1-16)).

58. Next, the court attempted to move on to Mr. Perry.  People's exhibit 3, "Court's Exhibit 3" (p.18 (lines 17-23) demonstrates the following exchange:

> THE COURT:        All right, Mr. Edwards, have you discussed with Mr. Perry the proposed written Antommarchi Waiver?
>
> MR. EDWARDS:    I have, Your Honor.
>
> THE COURT:        Does your client wish to execute the waiver?
>
> Mr. EDWARDS:    No, he does not.

59. The Court moved on to Mr. Branch to have "Court's Exhibit 2" marked on the record. (p.18 (lines 24-25) -19 (lines 1-20)).  Then, the Court moved on to Mr. Anthony to have

"Court's Exhibit 3" marked on the record. (p.19 (lines 21-25) -20 (lines 1-17)).  Mr. Perry

was present in the courtroom when the court ordered Mr. Anthony to be removed from the

court but told Mr. Anthony "…Your attorney can bring you that paperwork…"; to which

Mr. Anthony replied, "I took my *paperwork.*" (emphasis added).

60.  Thus, when Mr. Perry was discussing the "paperwork" that all of his co-defendants were

given in court, but that he lacked, it was the "paperwork" of the court's exhibits 1, 2 & 3.

There was no prohibition against a defendant receiving a copy of "the proposed

Antommarchi Waiver" whether it is signed or not.  At no time during the recorded

telephone call does Mr. Perry suggest that any of the "paperwork" taken by his co-

defendants violated the protective order. In fact, he explicitly states that he believes the

contrary.

61.  As a result, the recorded call made by Mr. Perry does not constitute reasonable suspicion

that (i) a violation of a protective order had been committed by or through his co-

defendants, (ii) they were involved in a crime or about to commit a crime, and/or (iii)

probable cause existed to support a warrant. There was nothing offered within that

recorded conversation that suggests that Mr. Perry, or anyone else, had any firsthand

knowledge of any documents possessed by any of the co-defendants. Accordingly, the

Soares' Office ordered this search of the defendants' cells based on pure speculation and

without a legal basis.  It was nothing more than an investigatory fishing expedition against

Plaintiff and the two other defense attorneys.

62.  Paragraph 11 of the Order to Show Cause demonstrates that, despite having full and direct

knowledge of the June 3, 2024 appearance and the documents given to defendants, and

having admitted to being in possession of the audio from Mr, Perry's jail call, Blaine-

Lewis still affirmed under the penalty of perjury, in paragraph 10 of her "Order to Show Cause Affirmation" that "On June 4, 2024,... In a call placed by Marcel Perry, he indicates *that all defendants but him have in their possession papers relative that violate the terms of the Protection Order*." (emphasis added).  Blaine-Lewis made this statement even though she knew that it was a misrepresentation of material facts.

63. The further concealment of Mr. Edwards as the source of the purported "facts" for the search, and the exclusion of his client's cell for the search, constituted official misconduct, and misled both the Sheriff's Office and the court.

64. A review of the plain language used by Mr. Perry would apprise any reasonable person of the fact that Mr. Edwards was the one alleging or believing that the other defense attorneys had engaged in misconduct, and neither Mr. Perry nor the recipient of the recorded call believed that to be true.

65. The search ordered by the Soares' Office resulted in the illegal seizure of legal documents from defendants' cells and violated their Constitutional rights.  To accomplish this goal, the Soares' Office intentionally misrepresented the above telephone call and omitted any facts that would have revealed the illegal nature of the search, thereby manipulating and deceiving both the Sheriff's Office and the court, and depriving defendants of any ability to challenge or defend against the search.

66. The Soares' Office sent the letter to the Albany County Sheriff Craig Apple and directed the Office of the Albany County Sheriff to search the cells of the defendants in this case for "...any material falling within the purview of Protective Orders be removed from the possession in accordance with your rules and procedures" without first receiving, or even seeking, a legal search warrant.  Moreover, this letter was never provided to the court or

the defendants as part of the Order to Show Cause, and was only discovered more than a

month after the Order to Show Cause was granted and after the State Police investigation

was commenced.

67. As clearly stated in this letter, which was written and signed by Horn, the order to search

defendants' cells was only requested for the purpose of investigating allegations of

criminal contempt and violations of the protective order, and not for institutional safety at

the Albany County Correctional Facility.   The purported confidential informant who was

allegedly threatened and who, without any factual basis, was supposedly identified in one

of the documents in defendants' cells, was *not* housed in the Albany County Jail; nor did

any of the items requested to be searched and confiscated threaten the safety or security of

anyone in the Albany County Correctional Facility.  Thus, there was no safety issue at the

facility which might have permitted a warrantless search for these documents.

68. Furthermore, the Soares' Office never advised the Albany County Sheriff that discovery

disclosures had been made to defendants by the Soares' Office prior to the existence of the

protective order and/or outside of its scope.  Thus, the Albany County Sheriff's Office had

no way of knowing what items, *if any*, found in defendants' cells may have violated a

protective order.  Moreover, the items seized from defendants' cells were confiscated

solely at the direction of the Soares' Office and without first obtaining a warrant.

69. Instead, the Soares' Office explicitly requested the Albany County Sheriff's Office to "sift

through" the defendants "legal research or legal papers" and make a determination of what

"discoverable" materials, if any, were in their possession that purported to constitute

evidence of "the offense of criminal contempt [pursuant to CPL 245.70(7)" against certain

defense counsel for "[an] intentional disobedience or resistance to the lawful process or other mandate of the court." (see, NYS Penal Law 215.50(3))

70. However, to determine if one of the defendants was in possession of discovery materials constituting a crime in violation of NYS Penal Law 215.50(3), the Albany County Sherriff's Office would have to find evidence that purports to support probable cause of both of the following two elements: "1. That on or about (a specific date) the (Albany County Supreme) court issued a lawful process or mandate, namely, [a protective order]; and 2. That on or about (a specific date) in the county of (Albany) the defendants, with knowledge of such process or mandate, engaged in intentional disobedience or resistance to it."

71. The Office of the Albany County Sheriff had no legitimate way to discern what "paperwork" purportedly violated the October 27, 2022 Protective Order without first knowing if it was obtained based on disclosures prior to or after the issuance of the protective order, and the legal knowledge to make those determinations. Thus, even the information needed to make the determination that the Soares' Office requested, was withheld by the Soares' Office.

72. It is indisputable that there was no legal basis for the search of defendants' cells requested by the Soares' Office.

73. On June 5, 2024, the defendants, including Plaintiff's client, were pretrial detainees at the Albany County Correctional Facility.

74. A pretrial detainee is an individual who has been charged with a crime but has not yet been convicted. In New York, pretrial detainees are presumed innocent until proven guilty,

and the primary purpose of their detention is to ensure their presence at trial. Their liberty

may not be restrained more than necessary to accomplish this objective.

75. Pretrial detainees in New York are entitled to due process protections under both the

United States Constitution and the New York Constitution. These protections include the

right to be free from conditions of confinement that amount to punishment and the right to

have their liberties restricted only to the extent necessary to ensure their presence at trial.

Thus, although incarcerated, pretrial detainees have some due process rights under both

the U.S. Constitution and the New York Constitution.

76. The rights of pretrial detainees must be balanced against the security concerns of the

institution. Restrictions on detainees' liberties must meet the standard of compelling

governmental necessity. This means that any security measures implemented must be both

reasonable and necessary to maintain security and order within the facility. Therefore, any

excessive restraints that are not justified by a compelling necessity violate the due process

rights of pretrial detainees.

77. A pretrial detainee has a limited and diminished expectation of privacy in his jail cell.

Inmates do not have a reasonable expectation of privacy in their prison cells, as such

privacy rights are fundamentally incompatible with the need for institutional security and

internal order. This principle has been extended to pretrial detainees as well, indicating

that they do not retain a significant expectation of privacy in their cells. Nevertheless,

pretrial detainees have some residual privacy interests protected by the Fourth

Amendment. For example, it is well established that a pretrial detainee retains sufficient

expectation of privacy within his cell to challenge a search ordered by a prosecutor for

investigatory reasons rather than for institutional security. Thus, while the general

expectation of privacy is limited, there are specific circumstances under which a pretrial detainee's privacy rights are recognized, and a pretrial detainee retains a sufficient expectation of privacy within his cell to challenge a search ordered by a prosecutor for investigatory reasons rather than for institutional security.

78. Accordingly, even though the Fourth Amendment proscription against unreasonable searches does not usually apply within the confines of the prison cell (because institutional security and internal order take precedence), there are limited circumstances – such as those presented by the investigatory order made by the Soares' Office – where their residual privacy interests of a pretrial detainee are protected under the Fourth Amendment.

79. Blain-Lewis affirmed under the penalty of perjury, in paragraph 12 of her "Order to Show Cause Affirmation" that "On June 5, 2024, the people notified the Albany County Correctional facility and requested that any material falling within the purview of the Protective Orders be removed from the defendants' possession."   Obviously, this did not concern an institutional safety issue, rather it was solely aimed at investigating a possible violation of the protective order by the defendants and their attorneys and thereby violated both the Fourth Amendment of the U.S. Constitution and Article I, Section 12 of the New York State Constitution prohibiting "unreasonable searches and seizures."

80. Blain-Lewis intentionally failed to provide both the court and the defendants' attorneys the letter sent by her office to the Albany County Sheriff's Office, which ordered the search of defendants' cells and clearly outlined the investigatory, rather than security, basis for that order.

81. The defendants in that criminal case never consented to their cells being searched and their property seized without a warrant, nor did they ever consent to (nor had they ever been asked to) the release of their property to any third party.

82. These omissions and misrepresentations constitute official misconduct, and violate New York Judiciary Law Section 487.

83. This misconduct by the Soares Office affected defendants, however, the requested investigation was primarily aimed at Plaintiff (and two other defense attorneys), and the Soares' Office used its violation of the Constitution to perform their illegal investigation.

**On June 11, 2024 Judge McDonough Ordered the Soares' Defendants to Remove Themselves from Any Further Investigation of Plaintiff, the Criminal Defendants and Their Attorneys**

84. The Soares' Office violated Judge McDonough's June 11, 2024 ruling when they admittedly, unlawfully and unilaterally appointed the New York State Attorney General as a Special Prosecutor for their investigation. The authority to appoint a special prosecutor in New York is vested in the courts and/or the Governor, not the district attorney.

85. Moreover, on June 11, 2024, Judge McDonough had already disqualified the Soares' Office from participating in the investigation ordered by the court and specifically assigned the New York State Police to conduct the investigation.

86. Nevertheless, based on admissions subsequently made by the Soares' Office in their papers, Blain-Lewis and Schultz remained participants in this investigation after the court's ruling on June 11, 2024. They disregarded the court's appointment of the State Police alone to conduct a forensic investigation and report their findings to the court and, working together with Sokolowski and Doe (who were also aware of Judge McDonough's June 11, 2024 ruling), continued the investigation. All four of these Defendants were

involved in such detail as to have participated in a June 27, 2024 debriefing of a defendant in another criminal case in which they attempted to get that defendant to "wear a wire" to get "dirt" on Plaintiff. During that debriefing, and in violation of Judge McDonough's explicit instructions on June 11, 2024, Blain-Lewis and Schultz also questioned and sought information pertaining to the State Police investigation ordered by Judge McDonough, and offered the debriefed individual a reduced offer if such information were to be provided. The Soares Office tried to conceal this meeting between these four Defendants by providing the Court with an affidavit from a member of the Albany Police Department who stated that he met that defendant that day with Blain-Lewis and Shultz and **no** State Police were present. But that was a red herring provided to mislead the court, that affiant was simply not present when Blain-Lewis, Shultz, Sokolowski and Doe met with that defendant later that same day and, as a result, that affiant was unaware of that fact.

87. Blain- Lewis and Schultz falsely claimed to the court that they were not involved in any continuing investigation on multiple occasions, including to Judge Marcelle on August 26, 2024. These false statements violated Judiciary Law Section 487.

88. Judge Marcelle asked why the Soares' Office was privy to certain information if they were not a part of the ongoing investigation and, although the Soares' Office had every opportunity at that time to make the admission that they later made in their papers, they did not. Blain-Lewis also stated off the record to the court and in a room full of attorneys that they "turned over all of the documents and removed themselves from the matter, and when the State Police returned with questions then they directed them elsewhere." Again,

the Soares' Office had every opportunity to make the same admissions that they made in their subsequent papers but, instead, chose to provide false information to the court.

89. Blain-Lewis intentionally lied to the court about the continued involvement of herself and Schultz in this investigation knowing that such involvement would have been in violation of Judge McDonough's June 11, 2024 order and would subject Blain-Lewis, Schultz and the Soares' Office to criminal contempt.

90. The Soares' Office chose to ignore the law and unilaterally act contrary to statute. The Soares' Office admitted this wrongdoing in their own papers.

91. These multiple false statements by the Soares' Office about the lack of any continuing involvement in the investigation, the actual continuation by the Soares Office of that investigation in blatant violation of a court order, and their continuing unethical, illegal and wrongful conduct violated the Constitutional rights of Plaintiff, including Due Process, as well as the incarcerated defendants. Indeed, most of the harm suffered as result of this conduct was borne by Plaintiff.

## The Actions of Blain-Lewis and Shultz Are Illegal and Constitute Official Misconduct

92. Blain-Lewis and Shultz committed official misconduct by acting in the capacity of an assistant district attorney without being legally authorized to act in that capacity.

93. Blain-Lewis and Shultz intentionally obtained a benefit and deprived Plaintiff of a benefit by (i) committing acts relating to their official office that constituted an unauthorized exercise of their official duties, because they knew such acts were unauthorized, and/or (ii) having knowingly refrained from performing a duty which is imposed upon them by law or was clearly inherent in the nature of her office.

94. County Law 702 explicitly requires that the appointment of an assistant district attorney be filed and recorded with the county clerk and that the appointed individual must take the prescribed oath of office. This requirement is clear and unambiguous. Thus, taking an oath of office is a necessary step before an assistant district attorney can commence their duties.

95. County Law 702, reinforced by Public Officers Law 30(1)(h), requires public officers to file an official oath within 30 days after the commencement of their term. Thus, each new term necessitates a new oath. This is in accord with the general principle that each term of office is a distinct period of service, requiring reaffirmation of the oath.

96. These procedural requirements are spelled out in N.Y. Crim. Proc. Code 264, which specifies that an assistant district attorney must have filed the constitutional oath of office in the county clerk's office to be allowed to appear before the grand jury. This provision highlights the importance of the oath in validating the appointee's authority to act in their official capacity.

97. The failure of an Assistant District Attorney to sign an oath of office has significant implications. According to County Law § 402, Oath of office, both the District Attorney and their assistants must take and file oaths of office. If an Assistant District Attorney fails to do so, they are deemed to have refused to serve, and their office may be filled as in the case of a vacancy.

98. Penal Law § 195.00, Official Misconduct, states that a public servant is guilty of official misconduct, a class A misdemeanor, if they commit an act relating to their office that constitutes an unauthorized exercise of their official functions, knowing that such act is unauthorized, or if they knowingly refrain from performing a duty imposed by law or

inherent in the nature of their office. Therefore, an assistant district attorney in New York who performs official duties without taking or filing the required oath of office could be charged with official misconduct, and exposed to sanctions, including but not limited to suspension or loss of license to practice law.

99. As of the end of last year, Blain-Lewis and Shulz, the assistant district attorneys who have participated in the underlying criminal case, had not filed with the Albany County Clerk's Office their appointments as Assistant District Attorneys and their oaths of office for the electoral term starting on January 1, 2021. In fact, Blain-Lewis had failed to file these items for at least the prior 10 years.

100. Due to their failure to properly file appointments and oaths of office for this term of office as Assistant District Attorneys, any and all actions taken by these assistant district attorneys from January of 2021 to December 31, 2024, was unauthorized, invalid and constituted official misconduct.

101. The County failed to ensure that Blain-Lewis and Shulz were properly trained, supervised, instructed and/or monitored to meet these requirements. As a result of that failure, the County facilitated, allowed and condoned the illegal and unconstitutional actions of Blain-Lewis and Shulz as set forth herein.

### Soares, the Soares' Office and Blain-Lewis Have Defamed Plaintiff

102. The specifics of the false and defamatory statements made by Soares on June 11, 2024 are already set forth above.

103. The statements by the Soares' Office have severely damaged and continue to damage Plaintiff including, but not limited to, the loss of clients, difficulties attracting new clients,

and lost opportunities.   They have also damaged his reputation with the courts in which

he practices and the attorneys he deals with on a daily basis.

104. Since the time of these statements, and continuing to this day, Plaintiff has been told by

clients, former clients, attorneys, community members and judicial members of the courts

that they understand that Plaintiff engaged in either improper, unethical and/or possibly

illegal conduct in his practice of law.  These false and defamatory statements have had the

impact of presenting Plaintiff as a bad, unethical and untrustworthy attorney.

105. These statements by the Soares Office were, and are, untrue and erroneous, and present a

false and unfair picture of Plaintiff as an attorney who disclosed confidential information,

violated a protective order, and thereby placed a witness's life in jeopardy, all of which are

not true.

106. These statements by the Soares' Office present Plaintiff as an attorney (or judicial

candidate) (i) who cannot be trusted, (ii) who ignores court orders that protect confidential

information, and (iii) who places witnesses in danger of their lives.  In other words, he is a

"bad' attorney.

107. The entire court record and transcript pertaining to the June 7, 2024 Hearing on the

Albany District Attorney's Order to Show Cause and the subsequent June 11, 2024

Hearing, which contain false statements by the Soares' Office were readily available to

Defendants.  Nevertheless, rather than retracting or correcting their defamatory statements,

those statements have, and continue to, severely harm Plaintiff, including but not limited

to lost clients, diminished ability to obtain new clients, lost opportunities and damaged

reputation.  Annualized revenue from lost clients alone far exceeds $100,000.

108. Mr. Mills demands trial by jury.

### FIRST CAUSE OF ACTION
### 42 USC §1983

**MALICIOUS ABUSE OF PROCESS**

109. Plaintiffs repeat and reiterate the allegations set forth in the preceding paragraphs as if fully set forth herein.

110. The Soares' Office intentionally, and without the right to do so, caused the issuance of regularly issued legal process, including without limitation, orders to law enforcement officials to carry out searches and investigations, and an appointment of a special prosecutor.

111. The Soares' Office acted with actual malice and harmful intent in causing the issuance of such process.

112. The Soares' Office used such process for purposes other than for which it was intended to gain collateral advantage or corresponding detriment to Plaintiff which was beyond the legitimate ends of the process, including the malicious attempt to destroy Plaintiff's professional reputation and economic livelihood, and to defeat the proper needs of justice.

113. Plaintiff was, in fact, harmed by the issuance and use of such process.

114. Through their actions, the Soares' Office intentionally violated Plaintiffs' rights protected by the 4th. and 14th Amendments to the U.S. Constitution. Consequently, Defendants are liable to Plaintiff for the injuries which were directly and proximately caused by the Soares' Office while acting within the scope of their authority

## SECOND CAUSE OF ACTION
## 42 USC §1983

### MALICIOUS PROSECUTION

115. Plaintiffs repeat fully and reiterate the allegations set forth in the preceding paragraphs as if set forth herein.

116. The Soares' Office initiated, or caused the initiation of, criminal proceedings against Plaintiff by, including without limitation, illegally and fraudulently (i) causing the search of Plaintiff's client's cell in order to find incriminating evidence against Plaintiff, (ii) filing documents with the court containing false statements concerning their allegations against, and investigation of, Plaintiff,  many of which were later reiterated in open court, (iii) continuing that investigation after being ordered by the court to discontinue and cease any further investigation, and (iv) appointing, or attempting to appoint, the Attorney General of the State of New York as a special prosecutor of Plaintiff.  The State Police Defendants assisted the Soares' Office in their efforts to prosecute Plaintiff even though the State Police Defendants knew that the Soares' Office had been court-ordered to remove themselves from any investigation of Plaintiff after June 11, 2024.

117. The Defendants acted with malice, as demonstrated by their fabrication, misrepresentation and withholding of evidence, their egregious deviations from acceptable investigative activity, their disobedience to court orders, their reckless disregard of Plaintiff's rights, and their pursuit of the investigation of Plaintiff and his prosecution without probable cause.

118. This conduct was unreasonable and violated Plaintiff's Constitutional rights.

## THIRD CAUSE OF ACTION
### 42 USC §1983

### DENIAL OF DUE PROCESS

119. Plaintiffs repeat and reiterate the allegations set forth in the preceding paragraphs as if fully set forth herein.

120. The Soares' Office intentionally and without the right to do caused the investigation of Plaintiff by, *inter alia*, (i) ordering and engaging in an illegal and unconstitutional search, (ii) making false statements in papers filed with the court, and in public, (iii) attempting to appoint the Attorney General as a special prosecutor in contradiction of law, (iv) ignoring and disobeying orders of the court, (v) illegally investigating Plaintiff, and (vi) by failing to perform the legally required duties of their office. The State Police Defendants assisted the Soares' Office in their efforts to investigate Plaintiff even though the State Police Defendants knew that the Soares' Office had been court-ordered to remove themselves from any investigation of Plaintiff after June 11, 2024.

121. The aforesaid conduct of the Soares' Office and the State Police Defendants was unreasonable and unlawful, and deprived Plaintiff of due process in violation of his Constitutional rights.

## FOURTH CAUSE OF ACTION
### 42 USC §1983

### CONSPIRACY

122. Plaintiffs repeat and reiterate the allegations set forth in the preceding paragraphs as if fully set forth herein.

123. The Defendants agreed among themselves to act in concert to violate Plaintiff's Constitutional rights.

124. Based upon the preceding allegations it may be reasonably inferred that the Defendants, either positively or tacitly, came to a mutual understanding to accomplish the common and unlawful plan to discredit and harm Plaintiff, including by unconstitutional means when necessary. Defendants have been successful in obtaining the goals of their conspiracy. Indeed, Defendants' joint plan has succeeded in discrediting and harming Plaintiff.

### FIFTH CAUSE OF ACTION
### 42 USC §1983

### EQUAL PROTECTION VIOLATIONS

125. Plaintiffs repeat and reiterate the allegations set forth in the preceding paragraphs as if fully set forth herein.

126. The Defendants violated Plaintiff's Constitutional rights to Equal Protection under the law.

127. Based upon the preceding allegations, Plaintiff has shown that the Defendants sought to eliminate Plaintiff as an adversary in court, at least in part, in violation of the Equal Protection Clause of the 14th Amendment. Defendants sought Plaintiff's elimination both because he is African-American and because his clients in the cases at issue above, and in the majority of other cases, are African-American. Defendants sought to achieve this goal by illegally and improperly discrediting and harming Plaintiff.

128. Plaintiff has been harmed by Defendants' discriminatory actions and statements in violation of the U.S. Constitution.

## SIXTH CAUSE OF ACTION

### FAILURE TO INTECEDE

129. Plaintiff repeats and reiterates the allegations set forth in the preceding paragraphs as if fully set forth herein.

130. Soares had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Soares failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

131. Blain-Lewis had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Blain-Lewis failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

132. Shultz had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Shultz failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

133. Horn had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Horn failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

134. Sokolowski had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Sokolowski failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

135. Doe had reason to know that each and every other Defendant had committed various violation of Plaintiff's rights under the U.S. Constitution and, despite being aware of those violations and having a realistic opportunity to intervene to prevent such harm from occurring, Doe failed to intervene to prevent any of those Defendants from infringing Plaintiff's rights under the U.S. Constitution.

136. Plaintiff has been damaged, in an amount to be determined at trial, by the failure of Soares, Blain-Lewis, Shultz, Horn, Sokolowski or Doe to intervene and protect Plaintiff from violations of his rights under the U.S. Constitution.

## SEVENTH CAUSE OF ACTION

### DEFAMATION

137. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

138. Soares made the above defamatory statements to the general public about Plaintiff on June 11, 2024.

139. Soares was not acting in his official capacity as the sitting District Attorney when he made the aforementioned defamatory statements about Plaintiff. Soares knew these statements, which were of and concerning Plaintiff, were false at the time Soares made them. None of the statements are privileged or amenable to a defense that Soares is immune from liability. Soares' statements were not made in the course of and concerning Soares' public responsibilities and duties and were made unnecessarily with the sole purpose and intent of harming Plaintiff. The defamatory statements did, in fact, harm Plaintiff.

140. Soares' false and defamatory statements were of and concerning Plaintiff and contained the false statements that Plaintiff engaged in improper and unethical conduct unbecoming an attorney.

141. Soares' false and defamatory statements were made with the intent to harm Plaintiff's good name and reputation by falsely claiming that Plaintiff engaged in improper, unethical and/or illegal acts.

142. Soares made these false and defamatory statements with actual malice and knowledge that the statements were false, or with reckless disregard of whether they were false or not.

143. Soares' defamatory statements continue to be published on the internet, and specifically on YouTube.

144. In carrying out the aforementioned conduct, Soares acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of his actions against Plaintiff, his reputation and his livelihood.

145. Soares' false statements are defamation *per se.*

146. As a direct and proximate result of Soares' intentional, malicious, false and defamatory statements, Plaintiff has been and will continue to be damaged and injured in his character, reputation and business.

## EIGHTH CAUSE OF ACTION

### VIOLATION OF JUDICIARY LAW SECTION 487

147. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

148. The violations of Judiciary Law Section 487 by the Soares' Office, as set forth above, whereby they deceitfully colluded to make multiple omissions and misrepresentations to the court and the parties before the court, constitute attorney misconduct.

149. Pursuant to Judiciary Law Section 487, this misconduct by the Soares' Office entitles Plaintiff to treble damages.

## NINTH CAUSE OF ACTION

### VIOLATIONS OF THE NEW YORK CONSTITUTION

150. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

151. The aforementioned Causes of Action brought pursuant to 42 U.S.C. Section 1983 for violations of the U.S. Constitution also establish violations of the similar rights set forth in the New York State Constitution. As stated herein, the actions of Defendants have

infringed Plaintiff's rights under the New York State Constitution and have damaged and injured Plaintiff's character, reputation and business.

**WHEREFORE**, Plaintiff Jasper L. Mills demands judgement from Defendants, as follows:

A. For an award of actual and presumed damages to be determined at trial, but well in excess of $9,000,000;

B. For an award of punitive damages;

C. For an award of costs, interest and attorney's fees; and

D. For any other relief that this Court deems just and proper

Dated: June 9, 2025

Respectfully submitted,

Jeffrey S. Shelly, Esq.
Bar Roll No. 2454908
Attorney for Jasper L. Mills

300 Tamarack Road
Summit, New York 12175
(518) 257-6428
jshelly@shellylawllc.com